## In re GILPIN.

(District Court, E. D. Pennsylvania. March 13, 1908.)

### No. 2,474.

1. BANKRUPTCY—DISCHARGE OF BANKRUPT—PROHIBITION AGAINST—BORROWING MONEY UNDER FALSE REPRESENTATION.

One borrowing money obtains "property" on credit, within Bankr. Act July 1, 1898, c. 541, § 14, cl. b (3), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), forbidding the discharge of a bankrupt who

has obtained property on credit upon a materially false statement in writing, etc.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

**2. SAME—INTENT TO DEFRAUD—ESSENTIALITY.**

Bankr. Act July 1, 1898, c. 541, § 14, cl. b (3), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), forbidding the discharge of a bankrupt who has obtained property on credit upon a materially false statement in writing, does not require a conscious intent to defraud to prevent a discharge; and hence a bankrupt was not entitled to a discharge where he signed a blank statement of his financial condition, which at his direction his bookkeeper filled out and sent to a bank, which lent the bankrupt money on the faith thereof, though, relying on the bookkeeper's honesty and accuracy, the bankrupt did not actually know of the material falsity of the statement and did not consciously intend to deceive the bank.

**3. SAME—TIME OF LOAN—EFFECT.**

Where a bank lent bankrupt $10,000 on the faith of a materially false written statement of his financial condition, it is immaterial, as affecting the bankrupt's right to a discharge within Bankr. Act July 1, 1898, c. 541, § 14, cl. b (3), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), forbidding the discharge of a bankrupt who has obtained property on credit upon such a statement, that $7,500 of the money was lent more than four months before the petition in bankruptcy was filed, where $2,500 was actually advanced within such period, though it be necessary, to prevent a discharge, that the property be obtained within such period, which is not decided.

**4. SAME—BURDEN OF PROOF.**

Though generally the burden is on a creditor to sustain his opposition to the bankrupt's discharge, the rule does not apply where the question presented is one of law, e. g., the construction of a statute, and not one of fact.

**5. SAME—"FALSE"—DEFINITION—"FALSE OATH."**

"False," as used in Bankr. Act. Act July 1, 1898, c. 541, § 14, cl. b (3), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), forbidding the discharge of a bankrupt who has obtained property on credit upon a materially "false" statement, means no more than "not true," though the word is flexible, and sometimes means "incorrect," and sometimes comprehends wickedness or fraud, as in section 29, where the term "false oath" means a corruptly false oath, such as would subject affiant to a prosecution for perjury.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2654, 2655.]

In Bankruptcy. Certificate of referee concerning objections to discharge of bankrupt.

John G. Johnson and J. Wilson Bayard, for bankrupt.
William T. Wheeler, for objecting creditor.

J. B. McPHERSON, District Judge. The question certified by the referee requires the court to determine whether clause b (3), § 14, of Act July 1, 1898, c. 541, 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1907, p. 1026), which forbids the discharge of a bankrupt if he has "obtained property on credit from any person upon a materially false statement in writing made to such person for the purpose of obtaining such property on credit," should be construed to mean,

that a conscious intent to defraud must be present. There is no such language in the clause, but in a recent case it has been held that the requirement of a fraudulent intent should be implied. Before considering what the clause means, the facts of the pending controversy may be stated. They are thus set forth in the report of the learned referee:

"The bankrupt was engaged in the construction of buildings at Baltimore, in places near New York City, and at Philadelphia. His main office was in Philadelphia, where his books were kept by a bookkeeper employed by him. It is not proved how long this bookkeeper had been in the employment of the bankrupt before the bankruptcy.

"The bankrupt was chiefly engaged in the actual supervision of the building work he was undertaking, and paid little or no attention to his books. He collected money, paid notes, and in a general way knew the condition and progress of each of his building contracts. He intrusted the keeping of his books to a bookkeeper, and in September, 1905, the posting of the books was some months behind.

"In September, 1905, the bankrupt went to the Merchants' National Bank at Philadelphia and stated that he wished to open an account, and that he would require accommodation not to exceed $10,000. The bank informed him that they would like to have a statement, and gave him one of their blank forms to be filled out and signed by him. This form the bankrupt took to his office, and there signed the same in blank, instructing his bookkeeper to fill it out and send it to the bank. He signed it in blank before it was filled out, for the reason that he was obliged to return to Baltimore without delay. He says he instructed the bookkeeper to give him an exact statement for the bank, to which the bookkeeper replied that he could not, but that he would make an approximate statement and send it to the bank. The statement was made by the bookkeeper, upon it was written the word 'approximate,' and it was sent by the bookkeeper to the bank."

The statement in full is as follows:

. Approximate Statement from

| Charles Gilpin, | Building Construction |
|---|---|
| (Firm Name.) | (Business.) |
| 1314 Pennsylvania Bldg., | |
| Phila., Pa. | (Branches.) |
| (Address.) | |

For the purpose of procuring credit from time to time with the Merchants' National Bank, Philadelphia, Pa., for our negotiable paper, we submit the following as being an approximate statement of our financial condition on the 28th day of Sept., 1905.

In consideration of such credit, it is hereby agreed that in the event of failure, or insolvency of the undersigned, all obligations of the undersigned held by this bank shall become immediately due and payable.

| Assets. | | Liabilities. | |
|---|---|---|---|
| Cash on hand..................... $ | 7,964 27 | Notes payable for merchandise.. $ | 12,500 00 |
| Cash in bank ..................... | | Notes payable to own banks.... | 15,000 00 |
| Notes receivable, due from customers ...................... | | Notes payable for paper sold.... | |
| Notes receivable, due from partners ........................... | | Notes payable for other accounts | |
| | | Open accounts ..................... | |
| Notes receivable, other than above ........................... | | Loans or deposits ................. | |
| Accounts receivable, due from customers (good) .............. | 92,325 00 | Mortgages or liens on real estate.. Accounts payable ................ | 37,620 00 |
| do (doubtful) ................. | | Other liabilities, . and of what composed ......................... | |
| Accounts receivable, due from partners ...................... | | Total liabilities ................ | 65,120 00 |
| Merchandise (how valued in shop) ........................... | 3,000 00 | Net worth ..................... | 43,569 27 |
| Real estate in name of firm...... | | | |
| Machinery and fixtures and tools | 4,500 00 | | |
| Office fixtures ................... | 900 00 | | |
| Other assets, and of what composed ........................... | | | |
| Total ..................... $108,689 27 | | Total ..................... $108,689 27 | |

Contingent liabilities: Accommodation indorsements; indorsed notes receivable outstanding.

Names in full of all general partners: Charles Gilpin.

Names in full of special partners with amounts contributed by each, and until when.

Insurance on merchandise,

Insurance on real estate,

Amount of annual business for present year, approximate, $800,000.

Dates of organization and expiration of partnership.

Date of last trial balance.

Place: 1314 Pennsylvania Bldg.

Date signed: Sept. 28, 1905.                    Charles Gilpin.

The referee's finding proceeds:

"This statement was laid before the advisory committee of directors of the bank, and afterwards before the full board of directors, and the bank extended the accommodation desired, based upon the statement, and upon a note which the bankrupt was to obtain from one Stokes, of Baltimore, and place the same as collateral with the bank. The note to be made by Stokes and placed as collateral was never obtained by the bankrupt for the bank.

"About October 3, 1905, after the statement of September 28, 1905, had been filed with the bank and passed upon by its directors, the bank discounted the note of the bankrupt for $7,500, due 30 days after date. This note was renewed on November 2, 1905, and on December 4, 1905, again renewed, in part, for $6,500. On December 4, 1905, the bank also discounted a 10-day note of the bankrupt for $2,500. On the 9th day of February, 1906, the bank renewed the entire amount then due, namely $9,000, for 30 days. The adjudication in bankruptcy was entered on February 26, 1906, and the bank holds the unpaid note for $9,000.

"It is not proved that in October, when the first note was discounted upon the faith of the statement, or at the time when either of the subsequent notes was discounted, the bank showed the statement to the bankrupt, or that he asked to see it; nor does it appear that the bankrupt ever saw the statement after he had signed it in blank until after the proceedings in bankruptcy had been commenced.

"The statement showed assets $108,689.27 and liabilities $65,120, and a net worth of $43,569.27. Counsel for the bankrupt states in his brief that 'as to the items which went into that net worth it was materially false and inconsistent with the books when Mr. Gilpin went into bankruptcy. The item of cash on hand was much larger than the fact. The accounts receivable were also stated at a larger amount than those accounts appeared upon the books, and the items of liability were each stated as smaller amounts than the books showed.'

"The bankrupt, upon his examination in the proceedings upon application for discharge, offered in evidence an approximate statement made by him of his financial condition on September 28, 1905. This statement in every item differs from the statement made by his bookkeeper, which was sent to the bank, and upon which the bank relied in discounting the bankrupt's notes. It is not necessary to state in detail the difference between the two statements. It is, perhaps, sufficient to say that as to the item of cash on hand, which, in the statement made by the bookkeeper and sent to the bank, is stated to be $7,964.27, the item of cash on hand in the statement made by the bankrupt and offered in evidence by him is stated to be $2,504.92. The net worth of the bankrupt is shown by the statement made by the bookkeeper to be $43,569.27 and by the statement made by the bankrupt $45,698.09.

"It is clearly proved by the evidence that it is impossible to make up from the books a statement such as that which was made by the bookkeeper. The bookkeeper, although residing near Philadelphia, was not called by the objecting creditor, or the bankrupt, to explain the statement made by him, and it is useless to speculate upon the methods adopted by him to fill out the blank form with the particularity exhibited in it.

"The approximate statement sent to the bank is materially false in all its items, and fails to coincide with the statement made up by the bankrupt

and offered by him in evidence upon his examination in the proceeding for discharge. The approximate statement made up by the bankrupt cannot be accepted in place of the approximate statement sent to the bank. The bank, in discounting the notes of the bankrupt, relied upon the approximate statement signed by the bankrupt and sent to the bank by his direction. The bankrupt did not at any time make request to see and examine the approximate statement which his bookkeeper had made up, but accepted the discount of his notes allowed by the bank upon the faith of the approximate statement.

"Although the bankrupt testifies that he did not instruct his bookkeeper to make and send to the bank a false statement, and that his instructions were to make an exact statement of his condition, and, when told this could not be made, then to make and send an approximate statement, and to mark the statement with the word 'Approximate,' nevertheless the discount of the bankrupt's notes was made and the money obtained upon a materially false statement in writing signed by the bankrupt, and without examination by him sent by his direction to the bank."

These facts bring the case precisely within the words of clause (3), and prima facie would require the discharge to be refused; but the referee declined to sustain the bank's objection, and gave the following reasons for his ruling:

"Although the falsity of the statement sent to the bank has been proved. the fact that the bankrupt knew it to be false, or did not know it to be true, must also be proved. The bankrupt has testified that he did not direct the bookkeeper to make up an incorrect statement, and that he had no reason whatever to suppose that he would not make a correct statement from the books. No evidence has been offered in contradiction of the bankrupt's testimony on this point. The bank did not at any time exhibit the statement to the bankrupt, or call his attention to it in any way. The bookkeeper has not been called as a witness. The burden of proof is on the objecting creditors, and the proof must be strict and convincing. There is no evidence to support the contention that the bankrupt knew, or had any reason to believe, that the statement sent to the bank by the bookkeeper was false, or that the bankrupt intended in any way to deceive the bank."

Exceptions were filed to this report, but the referee dismissed them, adding the citation of Re Dresser (D. C.) 13 Am. Bankr. Rep. 616, 144 Fed. 318, Id., 145 Fed. 1021, 74 C. C. A. 680, and Freyer v. McCord, 165 Pa. 540, 30 Atl. 1024, as authority for the foregoing conclusion of law. He then gave, as an additional reason for overruling the bank's objection, that clause (3) did not apply to the present case at all, because the borrowing of money was not the obtaining of "property" on credit, within the meaning of the clause under consideration. In support of this additional reason, he relied solely upon Re Pfaffinger (D. C.) 154 Fed. 528; and this is no doubt a decision squarely in favor of his ruling concerning the scope of the word just quoted. The position that when a man borrows money he does not obtain "property" on credit, within the meaning of clause (3), may be disposed of preliminarily and at once. It does not call for discussion at my hands; for, although any opinion from Judge Evans deserves and will always receive respectful consideration, it is only necessary now to say that his argument in Re Pfaffinger did not meet with the approval of the Court of Appeals for the Sixth Circuit. Judge Richards, speaking for that court (19 Am. Bankr. Rep. 309, 158 Fed. 403), gives the following reasons for reversing the decision:

"The court below took the view that the statute did not apply, because it applied only to a materially false statement in writing made for the purpose of obtaining property on credit, and that money is not property. In support of this view, Collier on Bankruptcy (6th Ed.) pp. 196, 197, is cited, and also the rule in U. S. v. Isham, 17 Wall. 496, 504, 21 L. Ed. 728, in which Mr. Justice Hunt, speaking for the court, says:

"'The words of the statute are to be taken in the sense in which they will be understood by that public in which they are to take effect. Science and skill are not required in their interpretation except where scientific or technical terms are used.'

"We approve of the rule laid down by Mr. Justice Hunt, but we do not think it sustains the construction claimed in this case. The position taken by Collier on Bankruptcy is in our opinion without support. If we were to apply the rule laid down by Mr. Justice Hunt, and take the common, ordinary meaning of the word 'property,' we think we would reach the usual definition given to the word; that is, 'anything of value,' 'anything that may be owned or possessed,' 'anything which has debt-paying or debt-securing power.' One of the common crimes is obtaining property under false pretenses. It has never been restricted to the obtaining of property other than money, but to the obtaining of property including money. No good reason can be advanced for limiting the term 'property' in this statute to property excluding money. Money is property in its most available and efficient form. According to the construction of the lower court, the bankrupt could, without subjecting himself to a penalty, obtain money by making a materially false statement in writing; but he could not, without subjecting himself to the penalty, obtain property, exclusive of money, by making such false statement. Still with the money which he could thus obtain without penalty he could readily purchase the property which the law prohibited him from thus obtaining. In our opinion the case of Pirie v. Chicago T. & T. Co., 182 U. S. 438, 21 Sup. Ct. 906, 45 L. Ed. 1171, 5 Am. Bankr. Rep. 814, settles the question. There the point was made 'that a transfer of any of his (the bankrupt's) property' was limited in meaning to a transfer of any of his property excluding money, and the court held that the phrase included 'anything of value, anything which has a debt-paying or debt-securing power; and money is property.'"

It being settled, therefore, that Charles Gilpin, the present bankrupt, obtained property on credit, namely, a loan of $10,000 from the Merchants' National Bank, the objecting creditor, it must also be regarded as beyond dispute that the foregoing written statement was made and successfully offered to the bank for the purpose of securing the loan, and that the statement was materially false. These facts are distinctly found by the referee, and are in effect conceded in the brief of the bankrupt's counsel. If, therefore, the statement had been written and presented by the bankrupt with knowledge of its falsity, the pending question could not arise; for both parties would then agree that the discharge might properly be refused, upon the ground that the inference of an intent to defraud could scarcely be resisted. But, in my opinion, the case is to be treated exactly as if the bankrupt had himself prepared the statement in question, and is to be decided without regard to the existence, or the absence, of an actual intent to defraud. I accept, and shall act upon, the finding of the referee that the bankrupt either did not actually know what the statement contained, or did not know that it was materially false, and that he did not have a conscious intention to deceive the bank. Nevertheless, the facts make it plain, as it seems to me, that he was chargeable with knowledge, and cannot avoid liability for the consequences of his ignorance and carelessness, not to say his reckless reliance on the cor-

rectness of his agent's statement. That he would be reponsible in a civil action—altogether aside from any intention to defraud—there can be no reasonable doubt. The situation is this: A principal directs his bookkeeper to do an act strictly within the line of the agent's duty, namely, to make a financial summary, compiled from the books in his care, and to show it to a person from whom a loan is expected, which can only be had if the facts which the agent is thus to put together disclose a solvent condition. The order of the principal is carried out; the summary is made and exhibited; the loan is obtained on the faith of its correctness; but the statement turns out to be false. It appears, also, that the principal, relying on the agent's honesty and accuracy, never takes the trouble to verify the summary, or even to look at it; but, with the knowledge that the creditor regards it as satisfactory, he accepts the money that is lent upon the faith of it, and therefore profits by the mistake, or (it may be) the fraud of his subordinate. Certainly, under such circumstances, a principal could not be permitted to disclaim civil responsibility for his agent's act, if it should afterward turn out that the summary was materially wrong, whether the error was due to the agent's negligence or to his fraud. If a principal intrusts an agent with power that is capable of abuse, and the agent does abuse it, the principal, as a general rule, is civilly liable, because he has armed his agent with ability to do wrong to others, and he must therefore make good whatever harm has thus befallen an innocent person.

These principles, I think, are not likely to be disputed; and, if they are correct, the civil liability of the present bankrupt for his bookkeeper's act must be admitted. The language of clause (3) puts the refusal of a discharge upon a civil liability, since the act that is visited with this consequence is not a crime (unless, indeed, the crime is to be implied), and it therefore remains to inquire whether the face of the clause should be so modified by implying an intent to defraud that the act denounced becomes the crime of false pretense instead of a civil default. This is the contention on the part of the bankrupt. He seeks to relieve himself from liability for his agent's acts, taking the position that the clause in question does not refuse a discharge unless he himself has been guilty of false pretense, as distinguished from civil misconduct. Of course, if clause (3), properly construed, does so declare, that is the end of the matter; and it is vital, therefore, to submit the clause to the established rules of construction, in order to get the meaning out of it, if possible, taking care to avoid putting into it a meaning that may seem to be desirable but is not really there.

It should first be observed, I think, that the clause in question is one of the amendments of 1903, and was not part of the act as originally passed. As thus passed in 1898, the statute specified as the only grounds for refusing a discharge (1) the commission of an offense punishable by imprisonment under a subsequent section, and (2) destroying, concealing, or failing to keep, books of account or records, with fraudulent intent to conceal the bankrupt's true financial condition and in contemplation of bankruptcy. The offenses which the act punished by imprisonment are set forth in section 29, and all

160 F.—12

involve the element of conscious fraud, namely, knowingly and fraudulently transferring or embezzling property, or concealing it from the trustee, and committing perjury by taking a false oath during the proceeding. So, also, it should be noted that the second ground for refusing a discharge was not complete unless the same element of conscious fraud was present. As a further civil penalty for fraudulent conduct, section 17 provided that a discharge should not affect "judgments in actions for frauds or obtaining property by false pretenses or false representations," or such debts as were created by the bankrupt's "fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity." When, therefore, the statute as originally drawn intended to make fraudulent intent a necessary element, it knew how to use appropriate and unmistakable language. Congress soon discovered, however, that section 14 was too generous in permitting discharges, and to remedy this defect (among others) the amendments of 1903 were adopted. These left untouched the provision that forbade a discharge when the bankrupt had committed one of the offenses described in section 29, but they made significant changes in two other sections, all of them putting new difficulties in the way of a discharge, or enlarging the class of fraudulently contracted debts upon which a discharge was to have no effect whatever. Thus, by the amendment to section 17, a creditor was relieved from the need to obtain a "judgment" in an action based upon the bankrupt's fraudulent conduct; for the amendment struck out "judgments in actions for frauds or obtaining property by false pretenses or false representations," and substituted the wider phrase—"liabilities for obtaining property by false pretenses or false representations." And in section 14 the second ground for refusing a discharge—destroying, concealing, or failing to keep, books of accounts or records from which the bankrupt's true condition might be ascertained—was materially changed by striking out the original qualification, "with fraudulent intent to conceal his true financial condition and in contemplation of bankruptcy," and substituting, "with intent to conceal his financial condition," thereby making essential the mere intent to conceal, whether or not such intent be fraudulent. Congress then proceeded to add four more grounds for refusing a discharge, of which two, the fifth and sixth, have no relevancy to the present inquiry. (The fifth forbids the discharge of a voluntary bankrupt more than once in six years, and the sixth forbids the discharge of any bankrupt if he has disobeyed a lawful order of the court.) The fourth ground, however, bears upon the question now under consideration. It forbids the discharge if within four months the bankrupt by act or permission has diminished his stock of valuable property; but, as it was obvious that not every such act or permission should be visited with the same consequences, Congress was careful to say precisely that the penalty was to be imposed only where the court should find an "intent to hinder, delay or defraud [the bankrupt's] creditors." Otherwise, the consequence would follow that any retail sale over the counter would prevent a discharge. The third additional ground for refusing a discharge is the clause with which we are now concerned; and, from the foregoing discussion of the original act and of the amendments,

I think it is fair to say that, if Congress had thought it wise to annex a fraudulent intent to the obtaining of property by a material false statement in writing, they would hardly have overlooked it. And this is especially true, because at the same time they were dealing with a similar intent in clause (2), immediately before the clause now in question, and also in clause (4), immediately after it. Certainly, as I think, it is wandering in the region of conjecture to say that a fraudulent intent should be implied in clause (3), in spite of the fact that Congress took the pains to express such intent distinctly in clause (2) as originally framed, and afterwards in clause (4), and could just as easily have expressed it again in the intermediate sentence.

But there are two other reasons, as I think, why the intent to defraud should not be implied in clause (3). The first is this: There is no need to imply it, and therefore the well-known rule of statutory construction is against the implication. If the fraudulent intent is inserted, as I am now asked to insert it, clause (3) becomes the precise equivalent of obtaining property by a particular form of false pretense; and with this form, and all other forms, of false pretense, section 17, both in 1898 and in 1903, deals effectively and completely, by declaring that debts thus fraudulently created are not to be discharged at all. Is it to be supposed that Congress, having preserved such debts from extinction by section 17, thus giving to creditors in this class all the protection that was necessary, nevertheless added what would seem to be a superfluous refinement, by declaring that, if the bankrupt had obtained the property by a false pretense that he had taken the trouble to write, he should not be discharged from any debt whatever, whether it were honest or were founded upon fraud? Or, to put the difficulty in other words, why should Congress punish a false pretense in writing by refusing a discharge altogether, while it only punished a false pretense that was spoken by preserving the particular liability thus created? I do not doubt the power of Congress to affix different penalties to different kinds of false pretenses, but surely there is an a priori probability that it is not intended to punish offenses differently that are essentially alike; and I think the court is therefore justified in laying stress upon the absence of definite and express language from which it might be seen clearly that a difference in punishment had actually been made. It must not be forgotten that the present argument is based solely upon the proposition that there is a necessary implication in clause (3) that requires a false pretense in writing to be dealt with differently from a false pretense in spoken words; and it seems to me, therefore, that in weighing an argument of this character it is legitimate to balance the probabilities for and against the construction insisted upon.

The second reason against implying the intent to defraud is to be found in the mischief at which clause (3) is evidently aimed. This is the obtaining of property by means of a written statement that is not true. It may be fraudulent, or it may be innocent; but in either event it does the same harm. The creditor loses his property because he relies upon a material statement which he can rarely check or verify, and the quality of the bankrupt's intention—whether it be good or

bad—is in no way essential to the result. Indeed, it may not contribute to the result in the slightest degree. The central fact is that a material misstatement has been made, for example, about the volume of the bankrupt's business, or the value of his assets, and, although the statement may be innocently mistaken, it does as much harm as if it were willfully intended to deceive. Why, then, should not Congress impose a civil penalty upon the bankrupt for the injury that he has done, even although he had no criminal intent? If he had a criminal intent, the statement becomes a false pretense at the common law, and is punishable by the criminal law of every state, from whose power Congress cannot relieve him; and it is also punished by the bankruptcy act itself, because section 17 refuses to discharge the debtor from the liability that has thus been fraudulently contracted. Since, therefore, two penalties are already provided—by section 17a (2), and also by section b (3)—for a false statement that is also fraudulent, why may there not be one punishment for a similar false statement (not fraudulent) that does the same harm, but differs from the fraudulent statement in the single fact that the bankrupt is not a conscious criminal?

Further, it is fair to require the bankrupt to know the important facts about his business, so as to be able to state them with substantial accuracy. The bankruptcy act endeavors to enforce this obligation by requiring him to keep sufficient books and records, at the peril of being refused a discharge if he shall fail to do so, with intent to conceal his financial condition—whatever other motive he may have. And, at the same peril—of being refused a discharge—clause (3) seems to require him to be substantially accurate whenever he seeks to use a written statement in order to obtain property from another person. If his books and records are properly kept, he can always know with sufficient precision where he stands; and if he keeps no books, or keeps them badly, so that his condition cannot be ascertained with a fair approach to the truth, he must take the risk and the consequences of being wrong, whenever he is reckless enough or careless enough to make written statements that do harm to his creditor. No doubt the bankrupt may sometimes rely innocently upon subordinates, and be misled by their negligence or by their fraud. This is his misfortune; and, whenever the effort is to charge him with conscious crime because he has acted upon an erroneous statement made by a clerk and accepted in good faith by himself, his lack of actual knowledge will, of course, protect him from criminal consequences. But, where he is not charged with a crime—and he is not so charged by clause (3)—I see no good reason why Congress may not properly hold him to a civil liability (even although it may be severe) for wronging his creditor by indorsing the errors or the lies of his agent. And, in this connection, it seems pertinent to point out the obvious danger of permitting the bankrupt to take shelter behind his subordinate's act, while he profits by the error or fraud which his duly authorized agent has committed in his name. The agent could not be punished (unless in the contingency that a conspiracy could be proved), because he himself does not obtain the property; and the principal would ordinarily escape, because of the practical difficulty of proving the actual fraudulent intent.

It is no doubt true that cases of hardship will arise in the application of this rule. The situation now being considered may present an example; but it is safe to say, I think, that a merchant (save in exceptional cases) knows, or can know, with approximate accuracy what he owes and what he owns, and that he ought to be perfectly able to make statements about his financial condition that are substantially close to the truth. Nothing more is required by the bankruptcy act, and this much at least may properly be required in the interest of a high standard of commercial integrity and of scrupulously fair dealing between debtor and creditor.

The cases in which clause (3) has been considered have not been numerous. Perhaps the earliest is Re Petersen, 10 Am. Bankr. Rep. 355, in which Judge Lochren concurred in the findings of the referee, who had refused a discharge because the bankrupt had obtained merchandise by means of a materially false statement in writing. No intent to defraud was found, and apparently none existed; for the referee said:

> "Nor can it make any difference whether or not (the statement) was intentionally false. The statute does not require that such a statement be intentionally false. It is sufficient to come under the ban of the law if it is materially false in fact, without regard to intent. The bankrupt above all others is presumed to know his financial condition, and he cannot be permitted to shield his reckless making of false property statements, upon the strength of which creditors relied and had a right to rely, but to their injury and loss, by a plea of ignorance of his true financial condition."

In the case of Margaret Goodhile (D. C.) 130 Fed. 782, 12 Am. Bankr. Rep. 383, Judge Reed refused a discharge upon the ground that the statement was "materially false, was made for the purpose of obtaining from this creditor property on credit, and upon the strength of which the property was so obtained by her." He added that "the bankruptcy law expressly provides that a discharge shall not be granted to a debtor who obtains property upon credit on a materially false statement in writing made for such purpose"—making no allusion to an intent to defraud. The case of Re Harr (D. C.) 143 Fed. 423, was decided by Judge Trieber, who refused a discharge because the bankrupt had "obtained the cattle on a credit from Wood Bros., upon a materially false statement in writing, made to them by the bankrupt for the purpose of obtaining the said property on credit." No reference is made to an intent to defraud, but in a later case (Re Collins, which will be considered in a moment) it is stated by the same judge that "in Re Harr there was no question but that the false statements were made knowingly." The case of Re Hardie (D. C.) 143 Fed. 607, decided by Judge Maxey, holds that a fraudulent statement made by one partner affects another partner, so as to prevent him from being discharged, although he himself (page 608) "did not participate in the wrongful act and had no knowledge of its perpetration." This decision is said (In re Collins) to be inapplicable, and it may perhaps be distinguishable. But if clause (3) requires, as is now contended, that an intent to defraud must be present, and therefore that the bankrupt must be guilty of false pretense, it seems no more than fair to say that, as a crime of one partner should not be imputed to the other, the discharge of the in-

nocent partner could only be properly refused on the ground that he was bound by the civil consequences of the false statement, although he himself·had no criminal intent. The referee, in Re Dresser (D. C.) 144 Fed. 318, 13 Am. Bankr. Rep. 637 (differing from Re Hardie, supra), held that, where one of two partners was ignorant of the making of a false and fraudulent statement by the other and took no part in the transaction, his discharge should be granted. This ruling was apparently acquiesced in by the parties interested before the referee, for no exceptions seem to have been taken to it, and no allusion is made to it, either by Judge Holt in affirming the referee's refusal to recommend the discharge of the fraudulent partner (13 Am. Bankr. Rep. 638, 144 Fed. 318), or by the Court of Appeals for the Second Circuit in considering the case afterwards (Re Dresser, 145 Fed. 1021, 74 C. C. A. 680, 16 Am. Bankr. Rep. 561). Indeed, so far as I can discover, the only case supporting the position now urged is Re Collins (D. C.) 157 Fed. 120, in which the same judge who decided Re Harr, supra, has squarely ruled (page 123) that a discharge can only be refused where the bankrupt has been "guilty of such acts as would sustain a civil action for fraud or deceit, and [where] the statements were either knowingly false or fraudulent, or made so recklessly as to warrant a finding that he acted fraudulently." With great respect for a view from which I feel obliged to differ, I may perhaps be allowed to suggest that the discussion in Re Collins seems rather to be rested upon the assumption that it would be a hardship to deny a discharge, unless the bankrupt has been guilty of false pretense or of deceit, than upon a preliminary application of the rules of statutory construction to the language of the clause then, and now, in question. If clause (3) is ambiguous, such considerations as appear in the following paragraph are no doubt pertinent:

"That the debtor must have known the representations to be false, or at least that he did not know them to be true, in order to prevent his discharge under the present bankruptcy act, is also the conclusion reached by the author of Collier on Bankruptcy (6th Ed.) p. 198. Any other conclusion would result in many instances in preventing a discharge of a worthy bankrupt, whose business was too large to permit him to attend to all the details thereof, including the keeping of the books. A man conducting a large mercantile business, employing a bookkeeper for the purpose of attending to the books, he attending to other branches of the business, has the right to rely on a statement prepared· from the books; and if, relying upon such a statement, he acts upon it in good faith, he is not guilty of such recklessness as amounts to fraud in the eyes of the law, or as should prevent his discharge. How many merchants can tell their liabilities. or even their assets, except by reference to their books? If, as happened in this case, the bookkeeper by reason of illness had to absent himself from business, and during that time some bills which arrived had not been entered, which fact is unknown to the merchant himself, shall it be said that a statement prepared in good faith from these books, if by reason of the illness, or even neglect, of the bookkeeper some liability was left off, thereby making the statement materially false, should be sufficient to brand a man as guilty of a fraud? Such is not the law. All presumptions are in favor of honesty, and, if the actions of a party are such that the presumption of honesty is as strong as that of wrong, the law requires that the theory of honesty, rather than that of guilt, be adopted."

This is the familiar and acceptable argument ab inconvenienti, which should always be considered where the language of the statute

is not clear; but it loses much of its weight where the clause is not of doubtful meaning. A situation of undoubted hardship such as was before the court in Re Collins—and may perhaps be also presented here—should not be allowed to lure the court to a construction that opens the door to evasion and fraud, and relaxes seriously a strong and needed motive to compel the debtor to exercise great caution whenever he is engaged in so important an act as the obtaining of property from a prospective creditor by means of a written, and therefore presumably a deliberate, statement.

It is also argued that, as the bank parted with the money more than four months before the petition in bankruptcy was filed, the clause under consideration does not apply. For this position the following sentence from Brandenburg on Bankruptcy (3d Ed.) § 370, is cited:

"While no specific time is fixed by the statute within which such statement must have been made, by analogy to other provisions of the law it is evident that Congress intended that the statement must have been made within four months of the institution of the bankrupt's proceedings."

No authority is quoted for this statement, and in opposition thereto reference may be made to Re Scott (D. C.) 126 Fed. 981, in which Judge Bradford (of this circuit) decided that a false statement made six months before the proceedings in bankruptcy barred a discharge. But the point need not be decided in the present case. The referee has found—and there is no dispute about the fact—that the statement in controversy was made for the purpose of obtaining a loan of $10,-000; and as $2,500 of this amount was actually paid over by the bank and was thus obtained by the bankrupt within four months before the petition was filed, it evidently makes no difference that the rest of the money was lent by the bank before that period began. It is "obtaining" the property that is made objectionable by clause (3). A false statement, innocent or fraudulent, does no harm unless it is successful, and the act denounced by the clause is not complete until the creditor parts with his money or other property.

One or two other matters may call for a few additional words, even at the risk of lengthening an opinion that is already too long. It is argued that the burden of proof is on the objecting creditor to sustain his opposition to the bankrupt's discharge. Speaking generally, this is true; but it does not apply to such a situation as is now before the court, where the question is of law, and not of fact. Here the dispute is solely concerning the construction of a statute, and, where that is the point at issue, there is evidently no burden of proof one way or the other.

The other matter that may properly need a moment's consideration is the effect that should be given to the word "false" in clause (3). In my opinion the argument for the bankrupt must rest wholly upon the construction that this word should bear. It is unquestionably a flexible word. Sometimes it means incorrect, or not true. Sometimes it includes the idea of wickedness or fraud—as in section 29, where a false oath is evidently a corruptly false oath, such as would subject the affiant to a prosecution for perjury. That "false" means no more in clause (3) than "not true" I have tried to establish in the preceding

pages of this opinion, and, if I have failed hitherto to give good reasons to my belief, I am sure that I shall not strengthen the argument by stating them àgain in somewhat different words.

The decision of the referee is reversed, and the clerk is directed to enter an order sustaining the first objection of the Merchants' National Bank to the bankrupt's discharge.